State ex rel. Howell, District Attorney pro. tem. et al. vs. Echeveria, Sheriff, et al.

## No. 8123.

THE STATE OF LOUISIANA EX REL. W. E. HOWELL, DISTRICT ATTORNEY PRO.
TEM. ET AL. VS. ARTHUR J. ECHEVERIA, SHERIFF, ET AL.

| 33 | 709 |
|----|-----|
| 45 | 184 |

| 33 | 709 |
|-----|-----|
| 118 | 111 |

| 33   | 709 |
|------|-----|
| f122 | 597 |
| 122  | 599 |

### ON THE MOTION TO DISMISS.

The Intrusion into office Act is yet in force and unrepealed or unaffected by any provision in the Constitution of 1879.

In proceedings under that Act, the failure of the State to appeal does not prevent any other party in interest from doing it.

Whilst this Court will not compel the Attorney General by Mandamus to take and bring up an appeal in the name of the State, still that officer cannot bind the State by acquiescence in a judgment adverse to her.

A mere allegation of acquiescence, contained in a motion to dismiss, unsupported by affidavit, does not justify the remanding of a cause for the purpose of having the question as to acquiescence tried in the lower court.

### ON THE MERITS.

The State has the undeniable power to prescribe qualifications as conditions precedent to the right to hold office, and, in ordaining such qualifications, the State Constitution could enact provisions with a retrospective effect, without violating the Federal Constitution.

Article 171 of the Constitution, providing for the ineligibility of public officers for certain causes, was intended to have a retroactive operation as well as to provide for the future. The reason, object and means of enforcing said Article 171, fully considered.

In an issue as to the eligibility of a public officer under the same Article, the *discharge obtained by him from the competent authority* cannot be attacked collaterally. It must be done directly, and the discharge must be averred to have been obtained by fraud or error.

The admission of Defendant, that he has made no settlement with the School Board of the Parish for school funds, though coupled with the allegation that he has disbursed more money than he received, on account of said Board, and that his vouchers have been filed with the State Auditor,—is a full solution of the question at bar. As he has not obtained his discharge from the proper authority, the School Board, he is not eligible under Article 171.

APPEAL from the Second Judicial District Court, parish of Assumption. *Knobblock*, J.

*Pugh & Howell*, for Plantiffs and Appellants :

### ON THE MOTION TO DISMISS.

First—Right to appeal must be tested by the state of facts existing at the time the appeal is taken. 20 An. 870, 112; 28 An. 231; 10 An. 324, 155; 14 An. 708; 14 An. 426; 32 An. 348: 28 An. 562; 30 An. 131; 31 An. 121; 10 L. 252; 13 An. 417; 14 A. 708; 6 L. 586.

Second—When motion for appeal is made in open court, jurisdiction of Supreme Court attaches on the signing of the order and filing bond. The State of Louisiana being exempt from giving bond, the signing of the order of appeal vested the jurisdiction of the appellate court. Supreme Court jurisdiction having once attached, the court *a qua* has no longer authority to take any steps but such as may be necessary to transmit the record to the appellate court. C. P. 514; 28 An. 542; Hen. 73, No. 3; 20 An. 293; 27 An. 431, 97, 684, 446; 24 An. 601, 599; 32 An. 816; 29 An. 350; 21 An. 154; 19 L. 173; 22 An. 518, 450; 21 An. 210, 213; 1 R. 527; 2 An. 628; 32 An. 15; 23 An. 31; 22 An. 39, 589; 25 An. 623; 32 An. 551; 25 An. 666; 10 R. 419; 30 An. 1016, 1028; 14 An. 157; 20 An. 236; 28 An. 568; 8 An. 434.

State ex rel. Howell, District Attorney pro. tem. et al. vs. Echeveria, Sheriff, et al.

Third—The State of Louisiana, Police Jury and School Board of the parish of Assumption are co-plaintiffs and joint litigants. The police jury and School Board have the right and authority to employ associate counsel. On motion of District Attorney, the associate counsel in this case were placed as attorneys of record for the plaintiffs. The District Attorney is estopped by his judicial admission in the pleadings from denying authority of associate counsel. 5 An. 119, 710; 28 An. 163; 24 An. 136; Dillon, p. 389.

Fourth—The right of appeal, the amount being sufficient, is guaranteed by the Constitution. 21 An. 114, 65; 28 An. 548, 881; 30 An. 71; Art. 81 Const. 1879.

Fifth—The District Attorney is not the State, but only the counsel for the State, and cannot acquiesce in a judgment under the intrusion in office act to the prejudice of the co-plaintiffs. 25 An. 434; 30 An. 70; 27 An. 320; 3 An. 292; 29 An. 147; 28 An. 344.

Sixth—The appeal bond being in favor of "clerk of court," are parties before the court. 23 An. 376; 30 An. 181; 24 An. 442; 25 An. 37-220; 26 An. 220, 312; 32 An. 30.

Seventh—Under the intrusion in office act, the suit must be brought in the name of the State, on the relation of any person interested, the name of such person being joined with the State as plaintiff. The duties of District Attorney under this act are ministerial; can be forced by "mandamus" to bring suit and to prosecute it. Secs. 2593, 2596 R. S.; 21 An. 655; 25 An. 15, 365; 24 An. 149; 31 An. 643; 23 An, 787.

Eighth—No inquiry can be made on a motion to dismiss, as to the interest of parties appealing. This comes up on the merits. 21 An. 670; 26 An. 43; 30 An. 70; 28 An. 548.

Ninth—Appeal bonds are for the amount fixed by the District Judge; this suffices. Hen. 51, No. 6; 26 An. 530; 31 An. 501; 27 An. 97; 21 An. 597; 20 An. 341; 24 An. 551, 475.

Tenth—The State of Louisiana is exempt from furnishing bond. She is sovereign, and in requiring other parties to give bonds, she is legislating for her citizens, and not imposing restrictions upon herself. 1 Kys. 262; Rex vs. Earl, Bunbury 33; Rex vs. Pickey, Id. 202; 3 McL. 483; 5 McL. 133; 3 Pet. 12; 5 Pet. 293; 14 Pet. 315; 20 Wal. 255; Greinn vs. Pendergast, 2 R. 237. "From giving the surety no appellant but the State can be dispensed."

## On the Merits, on Application for a Rehearing.

First—What is the nature and true and only object of this action? None other than to test the defendant's eligibility to be elected to and hold office. R. p. Pet.; R. S. Sec. 2593.

Second—This is a statutory remedy, and can be applied only in the manner and only for the purpose expressly pointed out by the statute. R. S. Sec. 2593 et seq.

Third—No examination of accounts can be gone into, no moneyed judgment rendered either in favor of plaintiff or defendant.

Fourth—The judgment to be rendered here cannot be pleaded in bar against any suit brought, or to be brought, against this defendant for a moneyed judgment. Nor can this action be pleaded as res judicata against the school board suit. The objects of the two suits are entirely distinct, and the issues in no manner connected. The one is for a moneyed judgment by a municipal corporation, the other a suit brought by the State of Louisiana to test the eligibility of one of her citizens to hold office. 29 An. 230; Hennen, vol. 1, p. 750, No. 3 et seq., No. 11.

Fifth—The intrusion into office act is not repealed by the Constitution of 1879, and is the proper and only remedy to be applied in cases of this nature. Const. Arts. 258, 152, 196, 201; 32 An. 942.

Sixth—The only fact to be ascertained is, does defendant meet the requirements of Art. 171 of the Constitution of 1879, viz., did he possess, or had he obtained on the day he was voted for, proper discharge for all public funds to him entrusted. Const. Art. 171; R. S. Sec. —.

*Walter Guion* and *R. N. Sims* for Defendants and Appellees:

## On Motion to Dismiss.

First—In all intrusion suits the State is the only real party plaintiff, and all proceedings therein must be originated and conducted by the District Attorney or Attorney General. 21 An. 655-710.

State ex rel. Howell, District Attorney pro. tem. et al. vs. Echeveria, Sheriff, et al.

Second—Private individuals have no right to contest the title of a public officer or inquire into his right to hold office. 23 An. 25-784; 26 An. 272; 21 An. 655-710; 25 An. 364.

Third—Mandamus was the only remedy by which to force the bringing up of an appeal by the District Attorney. 23 An. 786; 24 An. 149.

Fourth—No appeal will lie where judgment has been acquiesced in, and this Court should remand the case for the purpose of taking evidence on that issue. 23 An. 272; 3 An. 115; 23 An. 37; 20 An. 574; 29 An. 576; 22 An. 105; C. P. 567; 28 An. 743; 18 An. 59-264.

Fifth—No appeal bond has been prescribed by the State, the only party entitled to appeal, and the only appellant, if such there be, and the appeal should be dismissed.

## ON THE MERITS.

First—That defendant can be removed only by an address of the Legislature, and not by a suit under the Intrusion Acts, which have been repealed by the adoption of the Constitution of 1879. See Arts. 152, 196, 201 of the Constitution of 1879; 28 An. 445; 32 An. 941 et seq.

Second—That the defendant, although not in possession of a written or technical discharge from the school board, holds the discharge contemplated by article 171 of the Constitution of 1879, having shown that he had paid out for account of said board more than he had received, and that this fact of overpayment is admitted by counsel for plaintiff. Record, pp.

Third—That the school board, having made itself a voluntary party plaintiff with the State, and having raised and tendered the issue of defendant's liability for school funds and the amount thereof, is bound by the admissions made in this case and the evidence adduced therein, and is precluded from contradicting or denying said evidence and admissions, which operate as an estoppel and form *res judicata* in the school board suit. Hennen, pp. 518, 519, 520, 521, 522, 523; 8 An. 126; Hennen, p. 761, No. 11; 24 An. 3; 20 An. 293; 12 An. 197: Hennen, p. 520, No. 25; 26 An. 112; 28 An. 625.

Fourth—That by raising with and tendering to defendant in this suit the issue of liability and amount of his indebtedness to the school board, it has virtually abandoned its suit against defendant as a separate action, and consolidated it with this suit, and all the issues raised therein having been tried and determined in this suit, virtually puts an end to the suit of the school board, no objection having been made by any of the plaintiffs in this suit to all inquiry into defendant's liability for school funds and the amount thereof. Hennen, vol. 1, p. 1142, III. No. 2; p. 520, No. 25; p. 766, No. 42; p. 145, No. 4; p. 1539, No. 4; 10 An. 7.

## ON MOTION TO DISMISS.

The opinion of the Court was delivered by

LEVY, J. Appellee has filed a motion to dismiss this appeal on the following grounds:

1st. Because no appeal has been applied for by or granted to the State of Louisiana, the only party in interest, entitled, as plaintiff, to ask and apply for an appeal herein.

2d. That, even if any appeal has ever been applied for by plaintiff, the State of Louisiana (which, however, is denied), nevertheless the judgment of the Twentieth District Court herein in favor of defendant, has been acquiesced in by plaintiff and by the District Attorney representing plaintiff.

3d. That no appeal bond has ever been furnished by plaintiff, the only appeal bonds herein having been furnished by the Police Jury and

by the School Board of the parish of Assumption, who have no right or interest to appeal from the judgment herein; the only party in interest being the State, which has not appealed herein.

1st. The order of appeal was granted on motion made by counsel of plaintiffs. The District Attorney, the official representative of the State in this suit, had joined with him on the relation the Police Jury and School Board of the parish. The associate counsel for the State as well as other plaintiffs, had been recognized as such by this officer and on his own motion they were placed as attorneys of record for plaintiffs. The failure of the State to appeal does not prevent any other party in interest from taking an appeal, as this Court has recently decided in the case of State *ex rel.* Ford vs. Attorney General (not yet reported).

2d. In the case just cited, we distinctly held that, while this Court would not (under mandamus) compel the Attorney General to take and bring up an appeal in the name of the State, still such officer could not bind the State by acquiescence in a judgment adverse to her. And in this connection we may declare that a mere allegation of acquiescence contained in a motion to dismiss, unsupported by affidavit, does not justify the remanding of a cause for the purpose of having the question as to acquiescence tried in the lower court. Such practice, if sanctioned, would open the door to tedious and injurious delay and dangerous postponement of the settlement of the rights of parties litigant, and might work great wrong and injustice. To remand causes on mere allegations of acquiescence, not sworn to and not suggested in the record, would place in the hands of one of the parties to the appeal a means of protracting litigation unfair and injurious.

3d. The State is not required to give bond and security for an appeal in her own courts. 2 Rob. 237.

The motion to dismiss is denied.

### ON THE MERITS.

The State of Louisiana, on the relation of the District Attorney *pro tempore*, of the Police Jury and School Board of the parish of Assumption, instituted suit, averring that the defendant, who claims to have been elected and commissioned as sheriff of said parish, is ineligible, under Article 171 of the Constitution of 1879 to hold and exercise the duties and functions of this office; that in the years 1871 and 1872, the defendant was tax collector of said parish, and from 22d of March, 1872, to 17th of April, 1873, treasurer of the School Board of said parish; that, in his said official capacities, he received large sums of money, and that he is a defaulter, to a large amount, for the State and parish taxes collected by him; that he has never received a discharge for the amount of such collections and for all public moneys with which he was entrusted. The prayer of the

petition is that the defendant be decreed to be ineligible under Art. 171 and absolutely disqualified and prohibited from holding said office of sheriff.

Defendant, after pleading a general denial of the allegations of the petition, except as specially admitted in his answer, admitted that he filled the several positions as set forth, that he was Treasurer of the School Board and that he received from the State Treasurer a certain amount as the apportionment of the school fund belonging to his said parish, but denied that he ever diverted said amount from its proper channel. He avers that, after he ceased to be treasurer of the School Board, a committee was appointed by a subsequent School Board to examine his accounts as treasurer; that, after this committee had examined his accounts, they made a report to their School Board, that his accounts were correct and that he had properly accounted for all funds coming into his hands as treasurer of the Board; that said report was ratified and approved by the Board and that this action constituted his discharge; that a short time prior to the 20th of March, 1874, he turned over to Thos. L. Winder, then District Attorney, who was charged with the settlement of all claims in favor of the State and the School Board, all his vouchers and receipts, as treasurer, for moneys paid out and disbursed by him, which largely exceeded the amount of school funds received by him as treasurer, and that said vouchers and receipts were delivered by said Winder to Charles Clinton, then State Auditor, at the time defendant made a settlement with them for moneys received by him as State tax collector for 1871 and 1872, which vouchers and receipts have never been returned to him, which vouchers and receipts will show that he is in no manner liable or responsible as School Treasurer aforesaid; that, on the 26th of March, 1874, he received from the State Treasurer and Auditor of Public Accounts of the State of Louisiana, his final discharge and *quietus* as such for the amount of State taxes collected by him as State tax collector during the time he held said office; that on the 8th of October, 1875, he made a full and final settlement with the Police Jury of the parish of Assumption, for all parish taxes collected by him as tax collector during the aforesaid years, and was by said Police Jury discharged from all liability on account thereof and granted a full discharge and *quietus* by reason thereof. He pleads the unconstitutionality of the Acts of the General Assembly, Nos. 58 and 156, approved September 8th, 1868, and October 15th, 1868, as being in conflict with Articles 152, 199 and 201 of the Constitution of 1879; and that Article 171 is not retroactive and does not prescribe for causes of ineligibility arising previous to the adoption of said Constitution, and, if construed as being retroactive and retrospective in its operation, it is in conflict with Article 1, Section 10 of the Constitution of the United States, which declares that no State shall pass any *ex post facto* law.

The sole question for our decision in this case, under the pleadings, is the eligibility or ineligibility of the defendant to hold the office of sheriff; and it is still further narrowed down to the question whether or not the discharge or discharges which he alleges he has obtained, have been granted to him by competent authority, and fulfil that requirement of the article of the Constitution necessary to be observed and complied with to relieve him from the disabilities, without fulfilling which, such disability would rest upon him.

The right of the State, in its organic law, to prescribe general and uniform qualifications for the exercise of the voting franchise, is indisputable, and equally clear is her right to prescribe the qualifications for holding office. Limitations of this character are not obnoxious to the objection that they restrict natural or divest vested rights. It cannot be denied that she has the right of declaring when or at what age the voting franchise may attach, or at what age eligibility to hold office shall accrue, or that on reaching a certain age this eligibility to continue in office shall cease. The right to hold office is not a natural or divine right, at least under our constitutional and republican form of government, but thereunder offices are the creatures of popular will and appointments or elections thereto are not demandable of right by those who desire or seek office; on the contrary, those who create the offices and confer the positions are alone the arbiters between the wishes or demands of the aspirants and their fitness for place. To define the qualifications and limit the eligibility for office is no infringement upon, much less a divestiture of, vested rights. It seems to us unreasonable to limit the right to hold office to disqualifications arising subsequent to the adoption of the organic law, when its very object as gathered from its plain letter and obvious policy is to apply the disqualifications denounced to the existing status of persons at the time the instrument goes into effect, as well as to that which may subsequently arise or occur. Suppose a clause had been inserted in the Constitution declaring persons ineligible to the office of governor or judge *after* he shall have attained the age of seventy years, and previous to the adoption of such Constitution this ineligibility had not existed, would it be contended that one who reached the prescribed age prior to the adoption, did not fall under its operation and it was only applicable to those thereafter attaining the age?

Article 171 has no ambiguity. It was in our opinion intended to be retrospective and, if retrospective, it does not fall within the constitutional inhibition. In 11 Peters, 420, C. J. Taney delivering the opinion of the Court said: "It is well settled by the decisions of this Court that, a State law may be retrospective in its character and may divest vested rights, and yet not violate the Constitution of the United States, unless it impairs the obligation of a contract."

"In order that a law should be *ex post facto*, it must inflict 'some legal penalty, and this must consist *in taking away a legal right* or imposing some legal burden. The subject of electoral capacity has been left to the States absolutely untrammelled, except by the provisions respecting race and color, and any changes which the State may think best to make in defining the qualifications of voters, do not take away any right or impose any legal burden and cannot, therefore, be *ex post facto* laws, however much they may apply to past acts and transactions." Sedgwick on Construction of Stat. and Constitutional Law, p. 558; Pomeroy's Constitutional Law, §§ 532-535. The above is surely applicable in its full force to qualifications which may be required for holding office. 4 Wall. 172; 11 Pet. 420; 10 Howard, 395; 17 How. 456; 10 An. 745; 20 An. 533.

The article under discussion provides that those who have done certain reproachable acts shall be ineligible to public office in the State. A careful reading of this article, taking into consideration its manifest object and intention, conclusively shows that the disqualification for the future, embraced acts done in the past. It reads: "*No person who at any time may have been*," etc. If intended to apply *only* prospectively, it would have been couched in such words as *no person who shall be*, etc., *no person who shall hereafter be*, etc. Hence, we are satisfied that the disqualification imposed includes in its disabilities and affects those who have in the past fallen into the category named, until they shall cleanse themselves or "shall have" cleansed themselves in the manner distinctly pointed out in the closing clause of the article.

The pleadings and the evidence in the record show that the defendant had filled the certain offices as charged in the plaintiff's petition; that he had been entrusted with the public money and, therefore, in order that he should be eligible to office, he "should have obtained a discharge for the collections made, and for all public moneys with which he may have been entrusted." The construction of Constitutions, as well as of statutory laws must be governed by fixed rules and not left to arbitrary discretion or interpretation. The first thing then, to be ascertained in construction of statutes, is: *the* object to be attained, and, second, the means to be employed. The first "is, as a general rule, the intention of the law-maker;" the second, "what facts within and without the statute are to be inquired into to ascertain the intent of the doubtful phraseology." (Sedgwick on Construction, etc. 193).

As to Constitutions: "The whole must be considered with a view to ascertain the sense in which the words were employed; and its terms must be taken in the ordinary and common acceptation, because they are supposed to have been so understood by the framers and by the people who adopted it. This is unquestionably the correct rule of interpretation. It, unlike the acts of our Legislature, owes its whole force

and authority to its ratification by the people, and they judged it by the meaning apparent on its face according to the general use of the words employed, when they do not appear to have been used in a legal or technical sense." Id. 413.

In this case the defendant, as we have seen, pleaded that there was no outstanding indebtedness by him to the State, the parish or the School Board, and that he had received a discharge from these several parties plaintiffs, and having been duly elected and commissioned, was entitled to the office of sheriff, to hold which office, plaintiffs claimed that he was not eligible.

Article 171 prescribes that the ineligibility which it declares, shall continue only until the discharge shall be obtained. Whenever this discharge is had, his eligibility, which had been suspended, springs into existence. We are then called upon to further construe this article and interpret what constitutes the discharge required by the article. Applying the rule of construction, as laid down by the above authorities, we give to it the meaning of "its ordinary and common acceptation," in order "to ascertain the sense in which the words were employed." We think the ineligibility was intended to continue and remain in force as long as the indebtedness to the State, the parish or the School Board existed, that is, as long as they or either of them had any legal unsatisfied claim against the defendant. How or in what manner the discharge of the indebtedness or claim should be given, is not pointed out or prescribed by the article of the Constitution; no sacramental form is indicated or required. Indebtedness may be discharged or extinguished, in the ordinary or common acceptation of these words, in many ways, viz: by payment, compensation, voluntary release, transaction, etc., and when extinguished by any of these modes, a discharge, to all practical intents and purposes, is had.

As to the alleged indebtedness of defendant to the State growing out of his collection of State taxes, that indebtedness was fixed for a part by judgment obtained in favor of the State against him, which judgment appears in the record to have been satisfied. For the remaining indebtedness claimed under the transaction of compromise between the State and her proper officer, he made settlement with the Treasurer, authorized by the Auditor, receipt in full was given for the amount fixed and agreed upon in this transaction, and the usual discharge or quietus was issued by the last mentioned officer.

Under Sec. 176 R. S., it was made the duty of the Auditor, " to audit, adjust and settle the accounts of collectors of the revenue and other holders of the public money, who are required by law to pay the same into the treasury." Art. 178 R. S. enacts, that, " whenever the Auditor shall be satisfied, either from his own knowledge of fact, or by returns

made on execution or writs of *fieri facias*, that the State cannot make the amount due on the old bonds or obligations due the State, by compulsory process, then he is authorized to enter into such arrangements and make such compromises, either with the principals or their securities, as he may think most advantageous for the State, and to cancel such bonds or obligations upon payment of a portion thereof, and he shall report to the General Assemby the action he has taken and his reasons therefor." We think that, under the authority vested in him by this section, the Auditor had the right to make the arrangement and compromises whereby he, for sums paid by the defendant, extinguished the obligations of the defendant, and the claim of the State was satisfied and the defendant released and discharged from further liability for the collections made by him as tax collector. Plaintiffs' counsel contend that the Auditor's authority under Sec. 178, is limited to *old bonds*, given before the passage of the act. We cannot agree with him, but think the construction placed on it by defendant's counsel is the correct one, that is, by the words " *old bonds* " is evidently meant such bonds as have been given by those officers whose terms of office have expired, as contradistinguished from the bonds of officers who are in the actual performance of the duties of their office and whose terms of office have not expired.

As to the alleged indebtedness to the parish, we think the settlement of the Police Jury with the defendant and the quietus or discharge granted him, operates also as a discharge and cannot be attacked collaterally in this case, especially as it has not been alleged, even, that it was fraudulent, and we are, therefore, not called upon to express an opinion as to the right to attack it and seek to set it aside in a direct action, or upon proper allegations in this.

The alleged indebtedness to the School Board is denied by defendant and the evidence in the record shows that the defendant had received as Treasurer of the School Board, from the State Treasurer, the State apportionment to the School Board, or school fund of Assumption parish, the sum of $4,552 90, and that, in his capacity of School Treasurer, he had paid valid school warrants, for an amount largely exceeding that which he had received, and that these warrants, including the excess of his disbursements over his receipts, were deposited or surrendered to the Auditor, his claim (for such excess) being $4,223 35 against the State, for and on account of the State apportionment of school funds due or to become due to his said parish, and in settlement of the State's claim against him, he relinquished his own claim against the school funds and surrendered the whole of his vouchers and the receipts evidencing his claim.

It is true that no formal or technical discharge was ever given him by the School Board, based upon any technical settlement with the

Board, but the evidence discloses that he paid out on valid warrants of the Board an amount exceeding the sum which had come into his hands as treasurer, and no actual indebtedness existed on his part. There is no evidence disproving the payments, adduced by the plaintiffs. Regarding the object and intention of the constitutional provision to be for the purpose of preventing defaulting public officers from holding any office until they had discharged their obligations or as long as they were indebted to the State, parish, etc., on account of collections made by them or public moneys entrusted to them, and finding that the record shows no *actual* indebtedness existing, by reason of the payments made and the offsets held by him, we are forced to the conclusion that the defendant, under the spirit of the law, does not fall within the category of ineligibility as charged in plaintiffs' petition.

The judgment of the lower court is, therefore, affirmed with costs.

———

### ON REHEARING.

The opinion of the Court was delivered by

POCHÉ, J.   In re-opening this case we entertained no doubt as to the correctness of our conclusions on the preliminary questions raised in the pleadings and argued by counsel in their briefs.

We, therefore, reiterate our opinion in maintaining the right of the District Attorney *pro tem.* to bring this action, under the intrusion into office act, which we recognize as yet in full force and vigor, and unrepealed or unaffected by any provision in the Constitution of 1879, and we reassert the reasons under which we disposed of the motion to dismiss this appeal.

But we entertained some doubts as to the correctness of our construction of Art. 171, one of the most important provisions of the present Constitution.   Feeling that, in considering such an article, which now comes up for the first time for our investigation, in which we were necessarily not guided or assisted by any authority in point, we might have committed an error, we granted a rehearing on the question of the validity of the discharge which the defendant had set up in support of his eligibility to the office which he now holds. ·

After a careful attention to the able oral argument of counsel on both sides, and a close study of their exhaustive briefs, on rehearing, and after grave thought and reflection on the momentous questions involved in this controversy, we have reached the inevitable conclusion that we were in error in the construction which we had given to the article under consideration, and in our conception of the issue, which must be confined to the eligibility of the defendant, as evidenced by a discharge obtained by him from the competent authorities, with whose

funds, respectively, he had been intrusted, and that, therefore, we should not have considered the question, as to whether, under the evidence, he was or not yet indebted to the school board on account of any funds which he received in trust for said authority. Believing that the question of indebtedness or extinction of the same, otherwise than by a *discharge obtained* from the competent authority, should have been eliminated from the case, we shall now proceed to determine the defendant's status as to eligibility, under the qualifications prescribed by the Constitution in Art. 171.

In our first opinion we demonstrated that the right to hold office was not a natural or a divine right in a republican form of government, but that it partakes more of the nature of a privilege; that the State has the undeniable right to prescribe qualifications as conditions precedent to the exercise of such right, and that in ordaining such qualifications, a State Constitution, without violating the Federal Constitution, could enact provisions with a retrospective effect.

Hence it follows that ineligibility, flowing from acts omitted or committed in the past, could be and was contemplated in Art. 171, and that, if such ineligibility can be brought home to the defendant in this case, he must be excluded from the office which he now holds.

In construing this article we shall consider that the safest rule in the construction of constitutional provisions, as well as of statutory laws, is to investigate or discover, 1st, the reason of the law; 2d, its object; 3d, the means of carrying out the object proposed.

1st. By the light of history we know that the reason which imperiously dictated the policy embodied in Art. 171, is to be found in the numerous defalcations of fiduciary officers, whose short-comings had so seriously crippled the finances of the State.

The annals of the courts show that the parishes which were not the scene of such pillage, under color of their offices, either by tax collectors, officers of school boards, parish treasurers or other officers intrusted with the collection, administration or custody of public moneys, were among the few exceptions. The criminal dockets of the district courts shamefully teem with prosecutions against offenders of this class. And the history of those days also reminds us that, owing to corrupt political alliances, and other baneful influences, the accused were generally allowed to go unwhipped of justice, and that in many cases the odious culprits were soon after rewarded with other lucrative appointments in different localities. The natural and inevitable result of such spoliation was the increase of the burden of taxation on the one hand, until the weight was actually intolerable to the people; and the increase, on the other hand, of the debt of the State, whose revenue, extracted from the very life-blood of an impoverished people, was thus

squandered or otherwise misapplied, and was not forthcoming for the payment of her just liabilities. It is not rash to assert that through this system of organized plunder and robbery, millions of the people's money, extorted from them by means of tyrannical and oppressive taxation laws, found its way into dishonest hands, and never reached the coffers of the State. So much and such glaring dishonesty in public officers, who always succeeded in evading the law and escaping the just punishment of their criminal acts, had necessarily a very demoralizing effect upon the good people of the State, who soon lost all confidence in the officers by whom they were ruled, and all respect for a government ever ready and punctual in the enactment and enforcement of laws increasing the burdens of government, but always unwilling or powerless to execute the laws intended for the protection of society. Such a feeling of demoralization and dispondency among a people, unless checked at once, is always the forerunner of the decay or downfall of a republican government. Such was one of the many evils which confronted the Convention, whose members came fresh and direct from the people, with the solemn mandate to speedily check, by proper legislation, the further spread of this alarming and deep-rooted evil. The disease was serious and dangerous; it pervaded the whole body-politic, and it had to be met with heroic treatment. Hence the delegates proposed to the people the provisions embodied in Art. 171, under which unfaithful officers were to be cut off from the further exercise of power in the State; and we do not hesitate to assert that no feature of that Constitution received a more cordial support from the honest citizens of the State.

2d. After considering the reason of the law, it is easy to discover its object, which was to prevent a recurrence of the evil which prompted the legislation. It was intended to guard the people against the appointment, in the future, of men whose records were not unsullied and whose hands were not clean; of men who had failed to faithfully account for every dollar of public moneys intrusted to them in any capacity; and to give solemn assurance that no unfaithful, incompetent or dishonest official would ever be tried or appointed more than once.

The grand and patriotic object was, in removing all that class of dishonest officials from the possibility of ever again handling and spoliating public moneys, to deter their successors from following in their paths, and thus to restore to public officers the respect of their fellow-citizens, and to the State government, the confidence and the warm and active support of its good people, without which no government can exist or maintain itself.

3d. We have now to consider what was the nature of the means suggested for the accomplishment of such an important and vital object.

They must of necessity be energetic in kind, simple in their scope, and easy of execution. Hence it was proposed to exclude from the right of holding any office of honor, profit or trust, any person who may, at any time, have been intrusted with public moneys or any portion thereof, until he shall have *obtained a discharge* for *all* such public moneys.

Such a discharge, obtained of course from the proper authority, that is from the power or body from which the mandate or trust emanated, or for whose account the funds were received, was thus imposed as a condition precedent to eligibility in this State.

Hence it could not be contemplated that the discharge of a school board treasurer could be given by the State Auditor, any more than it could be contemplated that such a discharge could be obtained from the school board of a different or neighboring parish.

It follows, on the contrary, as a corollary from the main proposition that a discharge for State money must emanate from the State Auditor, guided by the laws governing such cases; that a discharge for parish funds must be issued by the police jury in conformity with law, and that a discharge for school money must be granted by the school board of the parish, in accordance with the powers conferred to it by law. And that the discharge, in either case, must appear of record in the proper office, must be of easy access to the public, and susceptible of being produced without delay, when needed. It was intended that the candidate, whose eligibility on that score would be questioned, either before or after the election, could at once refer to his discharge and quickly dispel all doubts as to his status. In a word, it was the manifest intention that, among former tax collectors and other persons heretofore intrusted with public moneys, none but those "clad in that livery," should aspire to the honors of a public office. It never entered the mind of the Convention that the question of indebtedness or extinction thereof, on the part of an officer elect, could ever be the issue in any litigation growing out of his alleged ineligibility for want of such a discharge, as a condition precedent to his election.

Nor was it ever contemplated that in a litigation of this kind, long intricate and confused accounts of a fiduciary officer claiming to be eligible, should be examined and settled by the court, under the simple issue of eligibility *vel non.*

The framers of the Constitution, in adopting this ordinance, understood that the certificate of fidelity to be obtained by the officer, must emanate from the body to whom he is accountable, to whom he must primarily and in due time present his accounts for examination and approval, and that the only issue to be presented to the courts would be the existence, or perhaps the validity of the discharge. It was contemplated that the issue thus presented and thus simplified would be speedily

46

tried and determined, so as to avoid among the people any suspense or doubt as to the legal status of the officers elected by them or appointed for them. Any other construction would defeat the object proposed by the Convention, and deprive the State government of the means of purifying the political atmosphere.

Let us now apply these principles, as a test in the case of this defendant, who admits to have received public moneys, as State tax collector, as parish tax collector and as treasurer of the school board of Assumption parish, and who urges his eligibility on the ground of a discharge obtained from the State authorities, and a like discharge from the police jury, and on the ground of his having overpaid the school board. We find in the record a settlement which he made for State taxes with the Auditor, who thereon granted him a quietus; and we find a similar discharge emanating from the police jury of Assumption, for parish taxes collected by him.

Plaintiffs' counsel urge and argue with considerable force that neither of those settlements, both of which appear on their faces to be mere adjustments or compromises, comes up to the standard required by the Constitution, which demands of the fiduciary officer a discharge for all moneys which had been intrusted to him.

But, on this question, we adhere to the ruling in our previous opinion, and will not allow a discharge emanating from a competent authority to be attacked collaterally, especially in the absence of any allegation of fraud or other malpractice in the manner of granting or obtaining the discharge.

We must be controlled by a discharge issued by the competent authority, unless it be directly attacked as fraudulent or erroneous. But, in so far as the school money is concerned, the defendant candidly admits that he has made no settlement with the school board, and that, therefore, he holds no discharge from that body, which was the competent and the only authority empowered to examine and settle his accounts, and to give him the discharge contemplated by the constitutional requirement. This admission is of itself a full solution of the whole question under the construction which we have placed on Art. 171.

His allegation that he has paid out more money than he had received, on account of the school board, cannot be entertained under the issue as narrowed down by the constitutional requirement, and all the evidence which he introduced in support of such an allegation, which consisted of an exhibit of school warrants which he had filed with the Auditor, an utter stranger in the premises, should have been excluded on the objection of plaintiffs' counsel, as entirely irrelevant and foreign to the issue. We do not propose to impugn either the character or the motives of this defendant, in thus declaring his ineligibility to the office

which he now illegally holds. But our duty is to give judicial vitality to an important article of the Constitution, calculated to give immense relief to the people of this State, to restore strict honesty in the administration of public moneys, and to strengthen the stability of our republican institutions. And if the defendant falls an innocent victim under a vigorous construction of an article looking to a reform in government, we may sympathize with him but are powerless to relieve him.

It is, therefore, ordered that our previous decree herein be reversed and set aside, and it is now ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed, and proceeding to render such judgment as should have been rendered, it is ordered, adjudged and decreed that the defendant, Arthur J. Echeveria, be declared to have been on the 2d of December, 1879, ineligible to any office of honor, trust or profit under the State government or any parish or municipality thereof, and to have been, therefore, not legally elected on that day as sheriff of the parish of Assumption, which office is hereby declared vacant, and that defendant pay all costs incurred in both courts.